Randy Lipsitz, Esq. (RL-1526)
Richard L. Moss, Esq. (RLM-7948)
Aaron M. Frankel, Esq. (AMF-9348)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Plaintiff,
Advance Magazine Publishers Inc.
d/b/a The Condé Nast Publications
                  &
Attorneys for Third Party Defendant,
Advance Publications, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE CONDÉ NAST PUBLICATIONS, <br><br> Plaintiff, <br><br><br> v. <br><br><br> ACTIV8NOW, LLC and ACTIVE8MEDIA, LLC, <br><br> Defendants, <br><br><br> v. <br><br><br> ADVANCE PUBLICATIONS, INC. and RICHFX, INC., <br><br> Third Party Defendants. | CIVIL ACTION NO.: <br><br> 05-CV-7516 (KMK) |

**PRE-HEARING ANSWERING BRIEF ON MARKMAN CLAIM TERM**
**CONSTRUCTION OF ADVANCE MAGAZINE PUBLISHERS INC. d/b/a THE CONDÉ**
**NAST PUBLICATIONS AND ADVANCE PUBLICATIONS, INC.**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

I.    INTRODUCTION .......................................................................... 1

II.   LEGAL STANDARD FOR CLAIM CONSTRUCTION ........................................... 2

III.  ACTIVE8 DID NOT INVENT THE INTERNET, HYPERLINKING
      OR INTERACTIVE DOCUMENTS .......................................................... 7

IV.   THE ACCUSED PRODUCTS ............................................................... 9

V.    ADVANCE'S PROPOSED CLAIM CONSTRUCTION SHOULD BE
      ADOPTED BY THE COURT ............................................................. 11

      A.  "Unique Identification Tag" (disputed term 3) .................................. 11

          1.  "Unique Identification Tag" Signifies a 1:1 Correspondance ................ 12

              (a)  Courts Have Construed the Plain Meaning of
                   "Unique" Identifiers as Requiring 1:1 Correspondence ................ 13

              (b)  The Intrinsic Record Confirms that "Unique Identification
                   Tag" Creates a 1:1 Correspondence ................................... 15

              (c)  Dictionaries Support Advance's Proposed
                   1:1 Correspondence Construction ..................................... 16

              (d)  Active8's Proposed Claim Construction for "Unique
                   Identification Tag" is Contrary to the Term's Plain Meaning ......... 17

          2.  "Unique Identification Tag" is Something Added to
              the Static Media Object ................................................. 19

      B.  "Conventional Static Media Object" (disputed terms 1 and 20) .................. 21

      C.  "In Response To" (disputed term 12) .......................................... 23

      D.  WWW Server "Limitations" (disputed terms 2, 6, 9-13, 17 and 18) ............... 25

KL3:2523985.1

## TABLE OF CONTENTS (CONT'D)

E.  Other Claim Terms in Dispute ........................................................................26

    1.  "Interactive Electronic Representation" (disputed term 2).......................26

    2.  "Multimedia Object" (disputed term 5)......................................................27

    3.  "User Identification Code" (disputed term 6)............................................28

    4.  "Receiving the Unique Identification Tag" and "Receiving the
       Unique Identification Tag and a User Identification Code"
       (disputed terms 9 and 10) .........................................................................29

    5.  "Associating Demographic Information With a
       User Identification Code" (disputed term 13) ...........................................29

    6.  "Receiving Control Input" (disputed term 14) ..........................................29

    7.  "Retrieving the Interactive Electronic Representation of the Static
       Media Object Basic Upon the Unique Identification Tag"
       (disputed term 18)....................................................................................30

VI.  CONCLUSION .......................................................................................................31

APPENDIX OF EXHIBITS

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Barry Fiala v. Stored Value Sys., Inc.*
2005 U.S. Dist. LEXIS 20068 (W.D. Tenn., Mar. 31, 2005) .......................................... 14

*Brown v. 3M*
265 F.3d 1349 (Fed Cir. 2001) ...................................................................................... 4

*Chimie v. PPG Indus., Inc.*
402 F.3d 1371 (Fed. Cir. 2005) ..................................................................................... 6

*Cias, Inc. v. Alliance Gaming Corp.*
2006 U.S. Dist. LEXIS 13610 (S.D.N.Y., Mar. 29, 2006) ..................................... 3, 5, 13

*Digital Biometrics, Inc. v. Identix, Inc.*
149 F.3d 1335 (Fed. Cir. 1998) .............................................................................. 4, 6, 24

*Elekta Instruments S.A. v. O.U.R. Scientific Int'l*
214 F.3d 1302 (Fed. Cir. 2000) (*en banc*) ................................................................... 15

*Gentry Gallery, Inc. v. Berkline Corp.*
134 F.3d 1473 (Fed. Cir. 1998) ..................................................................................... 6

*GLOBEtrotter Software, Inc. v. Elan Computer Group, Inc.*,
1999 U.S. Dist. LEXIS 22482 (N.D. Cal., Oct. 22, 1999) ............................................. 14

*Interactive Tech., Inc. v. Pittway Corp.*,
1999 U.S. App. LEXIS 11166 (Fed. Cir. 1999) ............................................................ 14

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*
445 F.3d 1348 (Fed. Cir. 2006) ..................................................................................... 9

*Markman v. Westview Instruments, Inc.*
52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996) ................................ 2

*Omega Eng'g, Inc. v. Raytek Corp.*
334 F.3d 1314 (Fed. Cir. 2003) ..................................................................................... 6

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................. 3, 4, 5, 6, 12, 16

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*
98 F. Supp. 2d 362 (S.D.N.Y. 2000), *aff'd,* 237 F.3d 1359 (Fed. Cir. 2001) ................ 4, 5

*Rheox, Inc. v. Entact, Inc.*
276 F.3d 1319 (Fed. Cir. 2002) ..................................................................................... 22

*Seachange Int'l, Inc. v. C-Cor Inc.*
   413 F.3d 1361 (Fed. Cir. 2005) ..................................................................................... 22

*Southwall Techs., Inc. v. Cardinal IG Co.*
   54 F.3d 1570 (Fed. Cir. 1995), *cert denied*, 116 S. Ct. 515 (1995)......................... 3, 6, 22

*Starpay.com LLC v. Visa Int'l Serv. Ass'n*
   2005 U.S. Dist. LEXIS 28 (N.D. Tex., Jan. 4, 2005) ...................................................... 14

*Texas Instruments v. U.S. Int'l Trade Comm'n*
   988 F.2d 1165 (Fed. Cir. 1993) ..................................................................................... 17

*Unique Concepts, Inc. v. Brown*
   939 F.2d 1558 (Fed. Cir. 1991) .......................................................................... 17, 20, 23

*Vitronics Corp. v. Conceptronic, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................... 3, 5

*Wilson Sporting Goods v. Hillerich & Bradsby Co.*
   442 F.3d 1322 (Fed. Cir. 2006) ....................................................................................... 9

## STATUTES

35 U.S.C. § 112 ............................................................................................................... 4, 5

## DICTIONARIES

THE AMERICAN HERITAGE DICTIONARY, 3RD ED. (1997) .......................................................16, 20

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) .......................................................... 16

KL3:2524137.1

## I.    INTRODUCTION

In this action, among several other claims and counterclaims, defendants Activ8Now, LLC and Active8Media, LLC (collectively, "Active8") assert infringement of two related patents (*i.e.*, the '006 and '889 patents). Plaintiff Advance Magazine Publishers Inc. d/b/a The Condé Nast Publications and third party defendant Advance Publications, Inc. (collectively, "Advance") maintain that they do not infringe any of the claims of the suit patents, and that the suit patents are invalid and/or unenforceable (indeed, Advance Publications, Inc. maintains that it had no involvement whatsoever with respect to the subject matter of the causes of action asserted by Active8). Advance submits this Pre-Hearing Answering Brief on Markman Claim Term Construction in support of Advance's claim term constructions as proffered in the Joint Claim Construction Statement ("Joint Statement") filed on May 8, 2006 (D.I. 49), and in opposition to both Active8's opening Brief on Markman Claim Construction and Active8's proposed claim term constructions also set forth in the Joint Statement.

Advance does not merely pay lip service to established claim construction principles under the developed jurisprudence as does Active8; rather, Advance's proposed constructions for the claim terms in dispute are the necessary result of appropriate application of such principles. Advance's proposed constructions are consistent with the ordinary and customary meanings of the claim terms themselves, and are supported within the context of the suit patent specifications as well as the patent prosecution histories.

In contrast, while Active8 generally cites to the correct precedent regarding claim construction principles, Active8 does not always follow its requirements. This is not surprising since Active8's proposed claim term constructions and its brief are all about avoiding rational claim construction in order to create the misimpression that the suit patents broadly cover online, interactive magazines rather than the incremental improvement over existing technologies that is

the actual invention claimed (namely, the addition of a unique identification tag to a static, non-

electronic page of a magazine or other document such that the unique identification tag serves to

uniquely associate the page with its corresponding interactive electronic replica stored in a

computer database). In its attempt to perpetuate this misimpression, Active8 not only avoids the

plain meaning of the claim terms, Active8 actually seeks to define affirmative claim terms out of

the claims. Also, Active8 skirts the context provided by the patent specifications, and avoids the

prosecution histories entirely and the express disavowels of claim scope made by Active8 itself

therein.

Active8's claim construction arguments are not only inconsistent with a proper

application of the developed claim construction principles, but are internally inconsistent.

Active8 impermissibly selectively reads claim limitations both out of and into the claim terms

(*i.e.*, from the patent specifications) when it suits its fancy, and, in the same breath, chastises

Advance for allegedly "cherry picking" elements of the invention described in the specifications

to read into the claims. The result is a serious misconstruction of key claim terms by Active8.

Active8's approach to claim term construction is inimical to the purpose of the

Markman analysis -- to determine the true meaning of the patent claims -- and is designed to

obstruct the Court's ability to properly carry out this function. The Court should reject Active8's

untenable proposed claim constructions and adopt the rational and supportable constructions

proposed by Advance.

## II.    LEGAL STANDARD FOR CLAIM CONSTRUCTION

The threshold issue in any patent infringement case is patent claim construction.

*See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*,

517 U.S. 370 (1996). Patent claim construction is a matter of law for the court. *Id.* In order to

ascertain the meaning of the claims of a patent, the court first looks to the "intrinsic" evidence of

- 2 -

record, namely, the patent itself including the plain language of the claims themselves, and the specification and the prosecution history of the patent including the prior art cited therein. [1] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1317 (Fed. Cir. 2005) (*en banc*). The court may not broaden or narrow the scope of the claims to give patentees something different from what they have chosen to claim as the invention. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995), *cert. denied,* 116 S. Ct. 515 (1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."). Although intrinsic evidence is primary in claim construction, the court may rely also upon "extrinsic" evidence, including dictionaries, expert and inventor testimony and treatises. *Phillips*, 415 F.3d at 1317; *see also Cias, Inc. v. Alliance Gaming Corp.*, 2006 U.S. Dist. LEXIS 13610 at *15 (S.D.N.Y. March 29, 2006).

The ultimate goal of claim construction is to determine the true meaning of the patent claims. The central underpinning to the court's claim construction analysis is recognition of the need to provide adequate notice to the public -- that is, the need for certainty in claim scope. As the Federal Circuit has stated:

> The claims, specification, and file history . . . constitute the public record of the patentee's claim, a record on which the public is entitled to rely . . . . "A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'"

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (citation omitted).

---

[1] The prosecution history of a patent is the entire public record of the prosecution of the underlying patent application before the U.S. Patent and Trademark Office ("PTO"), including the original application and any intervening applications as filed, all Office Actions issued by the PTO, and all Amendments, statements and other papers filed by the applicant(s) in response to action taken by the PTO.

Notice is not merely an important policy concern; it has an express statutory basis in the Patent Act. 35 U.S.C. § 112; *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998). The Patent Act, which provides that the specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," requires that the court look first to the language of the claims themselves to determine what "the applicant regards as his invention." *Phillips*, 415 F.3d at 1312; 35 U.S.C. § 112, second paragraph.

As the Federal Circuit explained in the *Phillips* case, "[b]ecause the patentee is required to define precisely what his invention is, . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* (citations and quotations omitted). This is why claim terms in a patent are generally given their ordinary and customary meaning -- from the perspective of a hypothetical "person of ordinary skill in the art" to which the patent at issue pertains at the time of the invention.[2] *See id.* at 1312-1313.[3] In such circumstances, general purpose dictionaries can prove helpful. *See id.* at 1314.

The claims do not stand alone, however. It is well-settled that claims must be construed in the context of the entire patent, including the patent specification and prosecution history. *Id.* at 1315. The Federal Circuit has stated that claims are to be interpreted so as to be consistent with "the fundamental purpose and significance of the invention" and in a manner "consistent with and further[ing] the purpose of the invention." *Purdue Pharma L.P. v.*

---

[2]  The time of the invention is the effective filing date of the patent application, here, circa 1999 for both the '006 and '889 suit patents.

[3]  Where, as here, the ordinary meaning of the claim language as understood by a person of ordinary skill in the relevant art is readily apparent, and claim construction involves little more than the application of the widely accepted meaning of commonly understood words, Federal Circuit precedent instructs that the court's evaluation is, in-and-of-itself, sufficient to satisfy the person of ordinary skill perspective. *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed Cir. 2001).

*Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362, 375 (S.D.N.Y. 2000), *aff'd* 237 F.3d 1359, 1364 (Fed. Cir. 2001) (citations omitted). As the Federal Circuit recently explained in the *Phillips* case:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316 (citation omitted).

In this regard, the courts have long appreciated that the patent specification, in particular, is highly relevant to the claim construction analysis. *See id.* at 1315. The importance of the specification in claim construction derives from the statutory requirement set forth in 35 U.S.C. §112, first paragraph, which provides that the specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." *Id.* at 1311, 1316.

As with the patent specification, the prosecution history is also often of critical significance in determining the meaning of the claims. *Vitronics*, 90 F.3d at 1582-83. In the *Phillips* case, the Federal Circuit clearly articulated the value of the prosecution history in determining the proper scope of a claimed invention:

> [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

*Phillips*, 415 F.3d at 1317; *Cias*, 2006 U.S. Dist. LEXIS at *23.

A patent applicant's statements made during the prosecution of a patent application or related applications are relevant in construing the meaning and scope of the claims. *See Digital*, 149 F.3d at 1344 ("The prosecution history is relevant because it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean."); *see also Southwall*, 54 F.3d at 1579 ("arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in <u>every claim</u> of the patent absent a clear indication to the contrary.") (emphasis added). Such statements can operate to limit the scope of the claims.

In particular, when a patentee disavows a certain meaning to obtain a patent, the doctrine of prosecution disavowal or disclaimer attaches and narrows the ordinary meaning of the claim congruent with the surrender. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (citation omitted); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1477 (Fed. Cir. 1998) (finding that remarks in Petition to Make Special can be relied upon to construe a term regardless of the term's apparent ordinary meaning). The public has a right to rely on definitive statements made during prosecution. *Digital*, 149 F.3d at 1347.

The court may also consider "extrinsic" evidence, such as dictionaries and treatises, and expert and inventor testimony to aid in claim construction, but must recognize its limitations. *Phillips*, 415 F.3d at 1318-1319 ("undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public

record consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents.") (citation omitted).

Advance urges the Court to apply the foregoing claim construction principles to construe the claim terms at issue as set forth herein and as proposed by Advance in the Joint Statement consistent with the ordinary and customary meaning of the claim terms themselves and in the context of the patent specifications as well as the patent prosecution histories blatantly ignored by the Active8 defendants in their opening brief but made of record by Advance herein.

## III.    ACTIVE8 DID NOT INVENT THE INTERNET, HYPERLINKING OR INTERACTIVE DOCUMENTS

Taking a page from former Vice President Al Gore's playbook, Active8 would have the Court believe that it invented the Internet, hyperlinking and interactive documents. However, even a cursory reading of the suit patents informs that they both concern only an incremental improvement over existing technologies -- namely, a specific method[4] to effect the display of an interactive electronic representation of a corresponding static media object (*e.g.*, a print magazine ad page).[5]

More particularly, the core of Active8's invention is directed to the addition of a "unique identification tag" to a static, non-electronic page of a magazine or other document such that the unique identification tag serves to uniquely associate the page with its corresponding

---

[4] The claims in both suit patents are all method claims as opposed to apparatus or system claims. A method claim is infringed by anyone who carries out all of the method or process steps recited in such claim, whereas an apparatus or system claim is infringed by anyone who makes, uses or sells the apparatus or system covered by the claim.

[5] Advance believes that even this narrow invention is fully anticipated by the prior art, including, without limitation, Catalog City, a website that provided users with interactive electronic representations of static media object magazines, and Otto, a CD-ROM-based interactive electronic representation of a print catalog.

- 7 -

interactive electronic replica stored in a computer database. A user inputs the unique identification tag into a computer application program which receives the unique identification tag and, based thereon, accesses the database and locates, retrieves and displays the corresponding interactive electronic replica of the magazine page. The user may then interact with the interactive electronic representation of the page by selecting portions thereof. When a portion of the interactive electronic representation is selected, additional information regarding the selected portion can be displayed to the user (*e.g.*, information concerning a new Michael Kors blouse worn by the model in a Michael Kors ad).

Now, years after the suit patents were prosecuted and issued by the PTO, Active8 is improperly attempting to broaden the scope of its claims through the claim construction process. Specifically, in its brief, Active8 distances itself from the consequences of the unique identification tag claim limitation present in all of the suit patent claims in an attempt to obtain a broad claim construction covering any interactive electronic representation of a static media object, regardless of how the two are linked. The reason for this clear. As discussed below, the accused Advance websites do not use unique identification tags. Accordingly, Active8 is left to argue that a unique identification tag need not be unique, doesn't have to identify and isn't a tag.

In this regard, Active8 would have this Court believe that a brand (trademark) depicted on a magazine ad page can serve as the claimed unique identification tag -- indeed, as the Court will soon come to appreciate, Active8's entire infringement case rests on this position. However, as Advance demonstrates herein, this position is untenable since a given trademark, which may appear on multiple advertisements throughout a magazine, is neither unique nor a tag in the sense described and affirmatively claimed in the suit patents. Where a trademark appears on multiple advertisements, it cannot be used to uniquely identify any single advertisement, and,

it follows logically, it cannot be used alone to retrieve a corresponding interactive representation of such single advertisement.

## IV.    THE ACCUSED PRODUCTS

Recent Federal Circuit decisions have signaled a change in the claim construction process requiring greater and more particular knowledge of the accused products by the trial court when construing claims. *See Wilson Sporting Goods v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330-31 (Fed. Cir. 2006); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006). Indeed, the Federal Circuit recently admonished the U.S. District Court for the Northern District of Illinois for not construing patent claims specifically with the accused products in mind. *Wilson Sporting Goods*, 442 F.3d at 1330-31.

Consistent with this recent Federal Circuit precedent, the discussion that follows is being provided as background for the Court to provide context for the claim term construction analysis in this case. Advance is prepared to provide evidentiary support for this background information by way of declaration, affidavit and/or live testimony as the Court may require or deem appropriate.

As set forth in the Amended Complaint in this case, plaintiff Condé Nast publishes many well-known magazine titles, including, *inter alia,* Vogue, Condé Nast Traveler and House & Garden. D.I. 25, ¶ 7. Each of these Condé Nast magazines has its own Internet website. In some cases, the magazine may have several different website addresses. *Id.* at ¶ 8.

In conjunction with Condé Nast's March 2005 issue of Vogue magazine, Condé Nast chose to engage counterclaim defendant RichFX, Inc. (given RichFX's expertise in converting print catalogs into interactive online catalogs) to develop interactive versions of selected advertisements appearing in the March 2005 issue of Vogue magazine and to host those interactive versions on Vogue's www.shopvogue.com website. Condé Nast also engaged

- 9 -

RichFX to develop interactive versions of advertisements appearing in the May 2005 issue of Condé Nast Traveler magazine and to host those interactive versions on Condé Nast Traveler's website. D.I. 25, ¶ 14. For its prior September '04 issue of Vogue, Condé Nast used Active8 for such services. *Id.* at ¶¶ 11, 21.

Active8's infringement contentions in this case are being leveled against only Condé Nast's March 2005 and March 2006 online, interactive issues of Vogue magazine, its May 2005 online, interactive issue of Condé Nast Traveler, and its April 2006 online, interactive issue of House & Garden. *See* Active8's April 11, 2006 Infringement Contentions.

Generally speaking, in developing and hosting online, interactive services for Vogue and Condé Nast Traveler magazines, RichFX obtained the advertisers' print ad pages (artwork) in a high-resolution PDF format. RichFX then constructed an interactive, online site for the given magazine based on product descriptions, pricing, imaging and other information from the ad pages. The resulting online versions of the ad pages were constructed to be fully accurate, high-quality replications of the print ad pages as provided to RichFX.[6] RichFX then hosted the interactive sites such that visitors could access the online advertisements, obtain additional information regarding the advertised products, and, perhaps, submit a request to obtain further information and/or purchase products.

Upon visiting the given magazine-related website, users were presented with different options for drilling down to particular ads. Generally speaking, users could search for ads by brand or by product category via conventional drop-down menus (something else asserted

---

[6] This is because it is unwritten law in the magazine advertising industry that ad pages must remain unaltered once turned over by the advertiser to the publisher (with the occasional rare exception of adding page numbers to an otherwise untouched, complete ad page when it is determined where such ads will be placed in a given magazine).

to be but not actually invented by Active8). Users could also choose to view all ad pages, which would result in presentation of thumbnail images of all ad pages. After making a selection by brand or product category, users were presented with thumbnail images of all of the ad pages associated with the selected brand or product category. To obtain additional information about the product(s) depicted in a given displayed ad page thumbnail, users could select a specific thumbnail image and an interactive version of the selected ad page would be generated and displayed alongside a separate window. "Mousing over" portions of the interactive ad page would cause the separate window to display the corresponding product depicted in the mousedover portion of the ad page and would provide the users with the capability to obtain further information and/or purchase the product.

Importantly, unique identification tags, as required in all the claims of the suit patents, were never used and, hence, played no role in the accused online, interactive sites for the Vogue, Condé Nast Traveler and House & Garden magazines. The Vogue, Condé Nast Traveler and House & Garden print magazine ads were not tagged with any identification information, let alone a "unique" identifier; it was, therefore, not possible to directly retrieve an electronic representation of a static print magazine ad. Instead, the user utilized the conventional browsing methods described above.

## V.    ADVANCE'S PROPOSED CLAIM CONSTRUCTION SHOULD BE ADOPTED BY THE COURT

### A.    "Unique Identification Tag" (disputed term 3)

As discussed above, the heart of the invention described and claimed in both suit patents is the use of a "unique identification tag" to uniquely link a "static media object" to its corresponding "interactive electronic representation." By Active8's proposed construction for the important claim term "unique identification tag," Active8 would have the Court read out the

words "unique" and "tag" from the claim term and construe it as merely an identifier. Such a construction, however, blatantly ignores the claim words "unique" and "tag" deliberately placed in the claims by Active8's patent counsel, and, as a result, alters the plain meaning of the claims. This revisionist construction is improper as a matter of law, and Active8 cannot avoid the fact that the terms "unique" and "tag" have a pervasive impact on the construction of all of the suit patent claims (the "unique identification tag" limitation is implicated in all of the claims of the suit patents) and a significant narrowing impact on the scope of the suit patents.

Advance urges the Court to construe the "unique identification tag" term congruent with its true, plain meaning as imparting important understandable and apparent limitations to the claims. First, a "unique identification tag" must be "unique." An identification tag identifies something; a "unique" identification tag on a given thing identifies one, and only one, other thing that corresponds to it -- here, this one other thing is a single interactive electronic representation of a static print page. Second, a "unique identification tag" is a tag, *i.e.*, it is an identifying mark that is added to something -- here, a static media object. As demonstrated below, Advance's proposed construction for "unique identification tag" stems first and foremost from the plain meaning of the patent applicants' chosen claim words, and is confirmed by the specification, prosecution histories and reference to contemporaneous dictionaries.[7]

### 1.    "Unique Identification Tag" Signifies a 1:1 Correspondence

According to Active8's actual claimed invention, each "unique identification tag" must be unique to a single static media object. That is, two different static media objects in the

---

[7] The words of a claim are to be given their "ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. The plain meaning (as would be understood by a person of ordinary skill in the art) serves as "an objective baseline from which to begin claim interpretation." *Id.* at 1313.

same collection cannot have the same unique identification tag -- otherwise, the identification tag would not be unique. This means that no two pages in a magazine can have the same identifier added thereto. Similarly, each unique identification tag must be uniquely associated with the single interactive electronic representation which corresponds to the static media object. Hence, the function of the unique identification tag is to form a connection between a single static media object and its single, corresponding interactive electronic representation. Throughout this brief, this property is referred to as "1:1 Correspondence."[8]

### (a)    Courts Have Construed the Plain Meaning of "Unique" Identifiers as Requiring 1:1 Correspondence

Recognizing the plain meaning of the term "unique," Courts have consistently construed "unique" identification-type terms as signifying 1:1 Correspondence. For example, Judge Kaplan of the S.D.N.Y. recently construed the term "unique authorized information" in a manner entirely in line with Advance's proposed construction of "unique identification tag." *Cias*, 2006 U.S. Dist. LEXIS 13610 at *23-26. In *Cias*, the parties disputed the scope of a term in patent claims covering an anti-counterfeit system for cashless slot machines. Judge Kaplan found that the term "unique authorized information" carried a "common and ordinary meaning," and construed the term to mean "information associated with each object, <u>unique to that object</u> . . . " *Id.* at *26 (emphasis added). In other words, Judge Kaplan concluded that identifying information is "unique" when it is associated with only a single object and not with another object in the same universe of objects under consideration.

---

[8] This discussion also applies to Advance's proposed constructions for the following disputed claims terms, each of which relate to the 1:1 Correspondence limitation: "creating an association. . ." (disputed term 11), "associating the physical static media object with a unique identification tag" (disputed term 16) and "associating the interactive electronic representation of the physical static media object with the unique identification tag" (disputed term 17).

The Federal Circuit and district courts in other jurisdictions have also construed the term "unique" in a manner consistent with both *Cias* and Advance's proposed construction. In *Interactive Tech., Inc. v. Pittway Corp.*, the Federal Circuit upheld the district court's construction of "unique identity code," finding that such code could be stored in a "code table" in system memory "only when no preexisting matching identity code exists." 1999 U.S. App. LEXIS 11166, *13-15 (Fed. Cir. 1999) (emphasis added). In *Starpay.com LLC v. Visa Int'l Serv. Ass'n*, the U.S. District Court for the Northern District of Texas construed the term "unique" to mean "that which is particular to or which only relates to a single transaction." 2005 U.S. Dist. LEXIS 28, at *9 (N.D. Tex., Jan. 4, 2005) (construing "unique identification identifier" as "specifically identif[ying] an individual transaction," rather than merely "allowing a party to positively identify a transaction"). In *GLOBEtrotter Software, Inc. v. Elan Computer Group, Inc.*, the U.S. District Court for the Northern District of California construed the term "unique identification" as meaning "identif[ying] each license file such that it will not be confused with any other license file then in existence." 1999 U.S. Dist. LEXIS 22482 at *35-36 (N.D. Cal., Oct. 22, 1999) (unpublished) (construing the term based on its relationship with the "installation program," which "must be able to distinguish the UID of any license file within its bailiwick from every other license file it may encounter."). In *Barry Fiala v. Stored Value Sys., Inc.*, an "identification number" that is "unique" was construed to be "associated with only one metered account." 2005 U.S. Dist. LEXIS 20068, at *31-32 (W.D. Tenn., Mar. 31, 2005) (emphasis added).

None of this should come as any surprise to the Court as something that is "unique" is one-of-a-kind.

(b)    **The Intrinsic Record Confirms That "Unique Identification Tag" Creates a 1:1 Correspondence**

The suit patent specifications support that the patent applicants intended "unique identification tag" to have its ordinary meaning, namely, an identifier that creates a 1:1 Correspondence. The specifications do not affirmatively recite a definition for the term "unique identification tag" (even though the specifications contain definitions for other claim terms), nor do they provide a context for any meaning other than the ordinary meaning of the term. Therefore, the term should be construed consistent with its ordinary meaning. *Elekta Instruments S.A. v. O.U.R. Scientific Int'l*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (*en banc*) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning"). The specifications, however, explain that "IERs [that is, interactive electronic representations] are referenced to corresponding static media objects by associating the same unique identifier with both the IER and the static media object." Exh. A ('006), 9:18-20; Exh. B ('889), 12:28-31. Similarly, the patents state that an application program "may receive the unique identification tag and, based upon the unique identification tag, locate and display the corresponding IER." Exh. A ('006), 2:37-41; Exh. B ('889), 3:9-12 (emphasis added). As discussed herein, the foregoing is possible only where the unique identification tag is linked to one and only one interactive electronic representation.

Furthermore, the prosecution histories for both of the suit patents contain no suggestion that the applicants intended for the "unique identification tag" limitation to have any meaning other than the 1:1 Correspondence disclosed in the specifications consistent with the plain and ordinary meaning of the claim term.

Additionally, the prosecution histories confirm the primacy of the "unique identification tag" limitation in that Active8's attorneys repeatedly argued it as being a feature

- 15 -

not found in the prior art and, therefore, a primary basis for the patentability of the asserted claims. *See e.g.,* Exh. D1 ('006 May 28, 2002 Office Action Response) at 5-8 ("Kirsch [a cited prior art reference] does not provide any unique identification tags on any physical static media object . . . Since Kirsch does not suggest placing any coded identifier on a physical object; Kirsch fails to anticipate the claimed invention and the rejection should accordingly be withdrawn."); Exh. D2 ('006 August 22, 2002 Office Action Response), 2; Exh. E1 ('889 May 21, 2002 Office Action Response) at 6-9. When faced with repeated rejections of the claims over prior art, Active8's attorneys amended <u>all</u> of the asserted independent claims to specifically recite that the unique identification tag must be located on the static media object. Exh. D3 ('006 November 4, 2002 Supplemental Amendment) at 9-13; Exh. E2 ('889 November 4, 2002 Supplemental Amendment) at 9-12. This further confirms that the unique identification tag is the central feature of the claimed invention, and, as such, cannot be read out of the claims as Active8 would have this Court do.

### (c)    Dictionaries Support Advance's Proposed 1:1 Correspondence Construction

The *Phillips* case recognizes that dictionaries, while considered extrinsic evidence, may be consulted to assist the Court in determining the ordinary and customary meaning of claim terms. *Phillips*, 415 F.3d at 1322. The dictionary relied upon by Active8 in its brief, namely, Webster's Ninth New Collegiate Dictionary, defines "unique" as "1: being the only one: SOLE . . . 2a: being without a like or equal . . . 2b: distinctively characteristic . . . ." Exh. G (WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY), 1290 (1991). Similarly, The American Heritage Dictionary defines "unique" as "1. [b]eing the only one of its kind. 2. [w]ithout an equal or equivalent; unparalleled." Exh. I (THE AMERICAN HERITAGE DICTIONARY), 1476, 3rd Ed. (1997). Thus, even the extrinsic evidence confirms that for an identification tag to be "unique" it

must be one-of-a-kind; in this, as an identifier, it must identify only one thing (*i.e.*, 1:1

Correspondence). Again, no surprise to anyone who has a grasp of the English language.

>          (d)     **Active8's Proposed Claim Construction for "Unique Identification Tag" is Contrary to the Term's Plain Meaning**

Active8 urges the Court to construe "unique identification tag" to mean simply "a

reference that corresponds to a Static Media Object." Active8 takes the untenable position in its

brief that a unique identification tag need not uniquely identify a single interactive electronic

representation, but rather, that it may merely have some unspecified association with any number

of static media objects and with multiple interactive electronic representations. Under this

construction, the unique identification tag would serve no meaningful purpose and would not

permit the ready retrieval of a specific corresponding interactive electronic representation. This

goes against the very purpose of the invention described and claimed in the suit patents.

It is black letter law that "[a]ll limitations of a claim must be considered

meaningful." *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991).

Construction of a claim in a way that "would render [a claim limitation] meaningless" or "mere

surplusage" is improper. *Id.* at 1563; *Texas Instruments v. U.S. Int'l Trade Comm'n*, 988 F.2d

1165, 1171 (Fed. Cir. 1993) (claim construction cannot "read an express limitation out of the

claims"). Active8's proposed construction of the claim term "unique identification tag" is,

therefore, improper as a matter of law because it renders the term "unique" meaningless. The

claims were intentionally drafted to require that the tag uniquely identify a single interactive

electronic representation, and so they must be construed. If the patent applicants truly did not

intend for the "unique identification tag" to be unique, the claims could have been presented

using different terms. In fact, Active8 appears to have done just that in its continuation-in-part

applications related to the suit patents currently pending before the PTO.[9]  *See* Exhs. L, M (U.S. Patent Application Publication Nos. 2004/0006509, 2004/0122731).  Construing the claims to require 1:1 Correspondence is enforcing a stated limitation, not improper importation from the specification.

Faced with the reality that the accused Advance online advertising sites did not use unique identification tags, Active8 is left to argue only the untenable position that the trademarks or logos on the Vogue, Condé Nast Traveler and House & Garden advertisements somehow constitute "unique identification tags."  However, this strained claim construction makes no sense, especially given that multiple ads in the same magazine can include the same trademark or logo.  For example, the March '05 print issue of Vogue and related online site contained multiple ads of the well-known retailer Target which bore the same Target trademark.  Therefore, the Target trademark was in no way a <u>unique</u> identifier.

Active8's position is further undermined by the suit patent specifications themselves.  The specifications make clear that a trademark is not the same as a unique identification tag; they describe them as separate and distinct objects -- *e.g.*, "Moreover, unique identification tags 204a and 204b may be shown <u>adjacent</u> to a well-known logo or symbol that a reader may associate with a WWW address."  Exh. A ('006), 7:53-55 (emphasis added).

Active8 further makes the untenable argument that (i) the claims discuss creating "an" association between the unique identification tag and "an" interactive electronic representation, (ii) the term "an" is grammatically ambiguous and encompasses both the singular

---

[9]  These CIP applications are meeting strong resistance from the PTO based on the prior art -- indeed, they currently stand finally rejected by the PTO.  *See,* Exh. J (May 22, 2006 Office Action issuing final rejection of all claims in application no. 10/250,179); Exh. K (June 6, 2006 Office Action issuing final rejection of all claims in application no. 10/459,397).

and the plural, and therefore (iii) 1:1 Correspondence is an improperly imported limitation. This argument is an anemic attempt to deflect the Court's attention away from a proper construction of the claims. Advance is not importing the term "unique identification tag" with its unambiguous meaning of 1:1 Correspondence into the claims; the term is already there in each and every independent claim. As demonstrated above, "unique" means one-of-a-kind. Moreover, the suit patent specifications are clear that the purpose of the unique identification tag is to link one static media object to that object's single corresponding interactive electronic representation -- the invention would not have a meaningful function if it did not. The cases cited by Active8 regarding the use of the word "an" are irrelevant here because they do not address a situation where the claims include language (*e.g.*, "unique") that unambiguously rules out the plural case.

Furthermore, Active8's own proposed claim term constructions set forth in the Joint Statement belie its arguments regarding use of the words "a" or "an." For example, comparing Active8's proposed construction for the disputed claim term "creating an association between the unique identification tag and an interactive electronic representation . . ." (disputed claim term 11) against the claim term itself, it is clear that the word "an" in the claim corresponds to the definite, singular article "the" in Active8's proposed construction. This is also true with respect to Active8's proposed constructions for other disputed claim terms which include the words "a" or "an" together with the term "unique identification tag." Thus, when Active8 prepared its portion of the Joint Statement, it understood "a" or "an" to mean "the."

### 2. "Unique Identification Tag" is Something Added to the Static Media Object

Advance also asks the Court to construe the recitation "unique identification tag" in accordance with the ordinary meaning of the word "tag." A "tag" means a "strip of leather,

paper, metal, or plastic <u>attached to something</u> or hung from a wearer's neck <u>to identify, classify,</u> <u>or label</u>." Exh. I (THE AMERICAN HERITAGE DICTIONARY), 1381 (emphasis added). Applied to the present case, it logically follows that the "unique identification tag" is a separate addition to the static media object to effect the unique identification function discussed above. Throughout this brief, this property is referred to as "Separate Addition."[10]

Active8 urges a construction where the "unique identification tag" is not a Separate Addition to the static media object, but rather any arbitrarily selected portion thereof. Under Active8's construction, the "tag" in one advertisement might be the color of a model's eyes, and in another advertisement a Gucci logo. In other words, according to Active8, the "tag" is really just an arbitrarily selected native feature or characteristic of the static media object. Active8's construction renders the word "tag" meaningless surplusage; under its proposal, the claims would read exactly the same if the term was deleted. Such a construction is flawed and must be rejected as a matter of law. *Unique Concepts*, 939 F.2d at 1562.[11]

Advance's proposed construction for "tag" honors the plain meaning of the term and is supported by the patent specifications which refer to "imprinting" the static media object

---

[10] The arguments set forth herein also apply to Advance's proposed constructions of the following disputed claim terms, each of which relates to the Separate Addition limitation: "Image" (disputed term 4), "the unique identification tag appearing on the static media object along with the image having at least two objects" (disputed term 7), "the unique identification tag appearing on the conventional static media object . . ." (disputed term 8), "identifying the physical static media object with a unique identification tag" (disputed term 15), "associating the physical static media object with a unique identification tag" (disputed term 16), and "imprinting a physical static media object with a unique identification tag (disputed term 19).

[11] Active8 also complains that Advance's construction "raises questions of temporal indefiniteness" because it is not clear when the separate addition is made to the static media object. This misses the point. A tag is something separate that is added for purposes of identification, in this case, unique identification. The claims do not place any temporal importance on when the unique identification tag is added to the static media object.

with the unique identification tag. *See, e.g.,* Exh. A ('006), 7:33-38, 8:66-9:9, 10:6-20; Exh B

('889), 12:7-11, 13:24-27. Furthermore, in all of the examples and drawing figures provided in

the specifications, the unique identification tag is non-native (*i.e.*, an addition) to the static media

object. *See id.*; Exh A ('006), Fig. 2; Exh. B ('889), Figs. 2 and 3c. In contrast, there is no

support whatsoever in the specifications for Active8's proposed construction of a tag as a

randomly selected feature native to the static media object.

Active8 notes that the suit patent specifications disclose the use of a page number

as a unique identification tag. Advance agrees that page numbers can be used as unique

identification tags. In a given publication, page numbers satisfy both the 1:1 Correspondence

(each page is uniquely identified with a page number) and Separate Addition properties (as noted

earlier, if a page number is to appear on a magazine advertising page at all, it is added to the

advertisement only after the magazine layout is determined, notwithstanding Active8's flawed

statement to the contrary in its brief). Trademarks and logos depicted in an advertisement cannot

satisfy the 1:1 Correspondence and Separate Addition properties, as they may appear on several

ad pages and are native to the advertisement.

### B.    "Conventional Static Media Object" (disputed terms 1 and 20)

Advance urges the Court to construe the disputed claim term "conventional static

media object" as limited to a physical static media object.[12] All the parties have agreed that in

the '006 patent the term "static media object" is limited to a physical media object (such as a

page in a print magazine or catalog), and does not encompass an electronic media object (such as

contained on a CD-ROM or a web page). Exh. H (Joint Statement) at 3. In the '889

---

[12] The arguments set forth herein also support Advance's proposed construction for "static media object" in the '889 patent (disputed term 20). The parties have agreed on the construction of "static media object" in the '006 patent (joint proposed claim term 1).

specification, "conventional static media objects" are explicitly defined as including electronic media objects; and hard copies are called "traditional static media objects." While this choice of language is confusing and nonsensical, during the prosecution of the '889 patent application, Active8 deliberately and unequivocally cleared up the confusion for the PTO by disavowing all electronic media from the scope of the claim term "conventional static media object." The purpose of this disavowal was to traverse invalidating electronic media prior art cited by the PTO Examiner. Active8's patent attorneys effected this disavowal in two ways. First, they specifically deleted claim language reciting electronic media.[13] Second, they argued that the invention was different from the prior art in that it linked physical (hard copy, not electronic) media to interactive electronic representations.[14] Having affirmatively surrendered the original electronic media scope to obtain the patents, Active8 cannot, as a matter of law, now recapture that scope during claim construction.

As discussed above, it is well settled that a patent applicant's arguments and actions during prosecution can narrow the scope of claims, even when a claim term is broadly described in the specification. *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (quoting *Southwall*, 54 F.3d at 1576); *see also Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) ("The

---

[13] During the prosecution of the '889 patent, the PTO Examiner rejected various claims in light of electronic media prior art. Exh. E3 (12/21/01 Office Action), 2-5. To overcome these rejections, the applicants deleted the words "comprising electronic content" from original claim 19, which ultimately issued as claim 1 and originally read "identifying a conventional static media object comprising electronic content with a unique identification tag." Exh. E4 (6/3/02 Amendment in Response to 12/21/01 Office Action), 14.

[14] The applicants also argued that, unlike invalidating prior art, their invention "provides a bridge between the <u>physical world</u> and the digital world." *Id.* at 6 (emphasis added).

prosecution history contains a public record of the patentee's representations concerning the scope of and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention .... Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language.") (citations omitted).

### C.    "In Response To" (disputed term 12)

The claims include several variations of the requirement of "providing an interactive electronic representation of the static media object in response to receiving the unique identification tag." (emphasis added). As demonstrated above, the heart of Active8's invention is using the unique identification tag to rapidly retrieve a corresponding single interactive electronic representation. Therefore, Advance proposes a straightforward construction of "in response to" compelled by the function of the claimed invention -- namely, that the interactive electronic representation is displayed in direct response to the supply of the unique identification tag, without the need for further input or information from the user.

Active8 coyly asks for a construction where "the www server transmits the interactive representation to a www browser of a user." This construction, however, goes against the purpose of the invention because it eliminates entirely the role of the unique identification tag. That is, Active8's proposed construction would define out the requirement for any causal connection whatsoever between the unique identification tag and the display of the interactive electronic representation. Hence, Active8's construction is, as a matter of law, improper and should be rejected. *See Unique Concepts*, 939 F.2d at 1562 (construction of a claim in a way that would render a claim limitation meaningless or mere surplusage is improper).

- 23 -

Even more telling is that Active8 proposed the following construction for "in response to" in disputed claim term 13: "[m]eans that the selection of the Multimedia Object by the user allows the www server to capture user Demographic Information without further input from the user." This is essentially the same construction of "in response to" that Advance seeks for disputed claim term 12 (that is, with respect to the "without further input" aspect; Advance agrees with this aspect of Active8's proposed construction). Active8 makes no attempt to reconcile its inconsistent proposed constructions. Surely, Active8 cannot reasonably expect to have it both ways. *See Digital*, 149 F.3d at 1345 (claim terms must be construed consistently).

Active8 also argues in its brief that Advance's proposed construction would make it possible to "avoid infringement by the addition of meaningless intervening steps to an otherwise infringing method." This ignores the whole focus of the claimed invention. The issue is not the timing or the absence of "meaningless" intervening steps, but the logical relationship between the unique identification tag and the interactive electronic representation. The unique identification tag must be sufficient to uniquely identify and retrieve the interactive electronic representation forthwith, otherwise the whole purpose of the invention (immediate retrieval of the desired interactive electronic representation by supplying the unique identification tag) is thwarted. Advance is not suggesting that interposing irrelevant, unrelated steps in between the supply of the unique identification tag and display of the interactive electronic representation would allow a user to escape infringement. Rather, it is Advance's position that if additional relevant steps are necessary to retrieve the interactive electronic representation, it cannot reasonably be said that the interactive electronic representation is provided "in response to the unique identification tag." Hence, Advance's proposed construction of "in response to" as signifying in direct response to is not an improper importation of a claim limitation as Active8

- 24 -

asserts, but rather is compelled by the plain meaning of the term in the context of the invention as described in the specification.[15]

### D. WWW Server "Limitations" (disputed terms 2, 6, 9-13, 17 and 18)

Active8 argues in its brief that the asserted claims are limited to embodiments where the interactive electronic representation is displayed over the World Wide Web (referred to hereinafter as the "WWW Limitation"). This argument is remarkable in that it is an example of exactly what Active8 repeatedly (and without justification) accuses Advance of doing -- namely, improperly importing limitations from the specification into the claims. The suit patent claims simply do not contain any terms that require a www server. Moreover, as discussed below, the invention described in the patent specifications is not subject to the WWW Limitation that Active8 seeks to impart to the claims. Therefore, Active8's proposed construction is not only improper as a matter of law, but it is also factually incorrect.

The suit patents describe applications of the invention that are based on the World Wide Web, and those that are not. For example, the following excerpt from the specifications discusses implementing the invention in a stand-alone (non-www networked) environment in addition to the Internet environment:

> Although the illustrative embodiment will be generally described in the context of an application program running on a personal computer, those skilled in the art will recognize that the present invention may be implemented in conjunction with operating system programs or with other types of program modules for other types of computers. Furthermore, those skilled in the art will recognize that the present

---

[15] In its brief, Active8 cites to several authorities to support the axiomatic principle that, in general, the steps of a method claim may be performed in any order and do not exclude additional unrecited elements or steps. This general rule has no relevance to the present case as the term "in response to" itself imposes a direct logical relationship between the supply of the unique identification tag and the display of the corresponding interactive electronic representation.

> invention may be implemented in a <u>stand-alone</u> or in a distributed computing environment. In a distributed computing environment, program modules may be physically located in different local and remote memory storage devices. Execution of the program modules may occur <u>locally in a stand-alone manner</u> or remotely in a client server manner. <u>Examples</u> of such distributed computing environments <u>include local area networks and the Internet</u>.

Exh. A ('006), 4:6-21; Exh. B ('889), 5:1-16 (emphasis added). Later on, the specifications

again describe both Internet and non-Internet based implementations:

> The personal computer 100 may operate in a networked environment . . . The host computer 140 may be a server, a router, a peer device or other common network node . . . The LAN 136 may be further connected to an internet service provider 134 ("ISP") for access to the Internet 138. In this manner, WWW browser 112 may connect to host computer 140 through <u>LAN 136, ISP 134, and the Internet 138</u>. Such networking environments are commonplace in offices, <u>enterprise-wide computer networks, intranets and the Internet</u>.

Exh. A ('006), 5:59-6:5; Exh. B ('889), 6:53-65 (emphasis added). In light of the broad

disclosure in the specifications of both Internet and non-Internet applications, how can Active8

now, with a straight face, take the position that the disclosure of the invention is limited to a

World Wide Web implementation -- perhaps, Active8's motivation has something to do with

avoiding invalidating prior art such as the Otto reference cited by both Advance and RichFX in

the Invalidity Contentions?

### E.    Other Claim Terms in Dispute

#### 1.    "Interactive Electronic Representation" (disputed term 2)

The parties disagree on two aspects of the proper construction of the claim term

"interactive electronic representation." First, Active8 urges the Court to read a WWW

Limitation into the claim term. For the reasons discussed above, importation of the WWW

Limitation is improper as a matter of law. Second, Advance requests a construction that the

"interactive electronic representation" is an electronic recreation of the static media object absent

the unique identification tag.  Such a construction is based on the disclosure in the specifications

of what an interactive electronic representation is and the function that it serves.  Specifically,

the unique identification tag is a tag that is added to the static media object to allow for retrieval

of the interactive electronic representation.  There would therefore be no point in including the

unique identification tag on the interactive electronic representation.  This view is confirmed by

the suit patent specifications which describe only interactive electronic representations without

unique identification tags.  *See e.g.,* Exh. A ('006), Fig. 3b (interactive electronic representation

shown with unique identification tag removed); Exh. B ('889), Figs. 3b, 3d (same).

### 2.    "Multimedia Object" (disputed term 5)

Advance's proposal that this claim term be construed to mean "[s]ound clips or

movie files associated with a Static Media Object" is supported by both the intrinsic and

extrinsic record.  The patent specifications state that the interactive electronic representation

consists of "text, graphic, or multimedia objects."  *See* Exh. A ('006), 11: 40-43; Exh. B ('889),

14-15: 67-4.  Thus, the patents describe three distinct types of objects: (i) text objects; (ii)

graphic objects; and (iii) multimedia objects.  Logically, a multimedia object cannot be a text

object or a graphic object; it has to be something else.  The specifications clarify this by stating

that the interactive electronic representation "may comprise multimedia objects, such as sound

clips or movie files associated with the static media object."  *See* Exh. A ('006), 8: 46-50; Exh. B

('889), 10: 29-33.  Thus, consistent with the specifications, multimedia objects are sound clips or

movie files associated with a static media object.

The extrinsic record also supports Advance's proposed construction.  As Active8

itself notes in its brief, Webster's Ninth New Collegiate Dictionary defines the term

"multimedia" as "using, involving, or encompassing several media."  Exh. G, 779.

Active8's construction "an object from a media database 'hot-linked' to an Interactive Electronic Representation that may be transmitted to a computer" does not define a multimedia object. The relevant inquiry is not whether a text object, or a graphic object or a multimedia object is hot-linked; rather, the relevant inquiry is what constitutes a multimedia object. Thus, Active8's construction entirely misses the mark.

Furthermore, how can Active8 argue with a straight face in its brief that Advance's definition of this term is an improper importation of limitations from the specifications when Active8's construction comes directly from the specifications? Active8's "definition" of "multimedia object" (which definition does not actually define the claim term) is straight out of the specifications: "[m]edia database contains IERs and other objects that are 'hot-linked' to IERs." Exh. A ('006), 9: 16-17; Exh. B ('889), 12: 26-28. Apparently, Active8's selection of definitions from column 9 of the '006 specification is proper, while Advance's reliance on disclosure from columns 8 and 10 somehow improperly imports limitations. Setting aside the issue of importing limitations from the specification, it is clear that Active8's construction fails because it does not actually define a multimedia object. Since Advance's proposed construction relies on the intrinsic record and is supported by extrinsic evidence, Advance's proposed construction is proper.

### 3.    "User Identification Code" (disputed term 6)

In an effort to reduce the number of terms for the Court to construe, Advance is willing to adopt Active8's proposed construction of the term "user identification code" minus the clearly unsupportable WWW Limitation. As discussed earlier in this brief, there is absolutely no basis to include the WWW Limitation. The inclusion of the WWW Limitation is a blatant attempt by Active8 to improperly import a limitation into the claims in an effort to overcome invalidating prior art cited by both Advance and RichFX in the Invalidity Contentions.

4.     **"Receiving the Unique Identification Tag" and "Receiving the Unique Identification Tag and a User Identification Code" (disputed terms 9 and 10)**

Advance does not believe that any constructions are required for these claim recitations beyond the constructions of the disputed terms "unique identification tag" and "user identification code" contained therein. Advance's position with respect to the disputed terms "unique identification tag" and "user identification code" is clear from the discussion of those terms set forth above (and incorporated by reference herein) and from the Joint Statement. Advance specifically objects to Active8's improper inclusion of the WWW Limitation in the subject claim recitations for the reasons articulated above.

5.     **"Associating Demographic Information With the User Identification Code" (disputed term 13)**

Advance does not believe that any construction is required for this claim recitation beyond the construction of the disputed term "user identification code" contained therein. Advance's position with respect to the disputed term "user identification code" is clear from the discussion of the term set forth above (and incorporated by reference herein) and from the Joint Statement. Advance specifically objects to Active8's improper inclusion of the WWW Limitation in the subject claim recitation for the reasons articulated above.

6.     **"Receiving Control Input" (disputed term 14)**

The only dispute with respect to this term concerns the definition of "multimedia object." Advance's position with respect to the term "multimedia object" is clear from the discussion of the term set forth above (and incorporated by reference herein) and the Joint Statement.

- 29 -

7.    **"Retrieving the Interactive Electronic Representation of the Static Media Object Based Upon the Unique Identification Tag" (disputed term 18)**

Advance does not believe that any construction is required for this claim recitation beyond the construction of the disputed terms "interactive electronic representation," "static media object" (with respect to the '889 patent) and "unique identification tag" contained therein. Advance's position with respect to the disputed terms "interactive electronic representation," "static media object" (with respect to the '889 patent) and "unique identification tag" is clear from the discussion of these terms set forth above (and incorporated by reference herein) and from the Joint Statement. Advance also notes that its position discussed above (and incorporated herein by reference) regarding the provision of an interactive electronic representation of the static media object <u>in response to</u> receiving the unique identification tag also has bearing on the proper construction of this claim recitation. Also, Advance specifically objects to Active8's improper inclusion of the WWW Limitation in the subject claim recitation for the reasons articulated above.

KL3:2520487.7

## VI.    CONCLUSION

Based upon the foregoing, Advance respectfully requests that the Court construe

the disputed claim terms in accordance with Advance's proposals set forth herein and in the Joint

Statement.

Dated: New York, New York
      June 12, 2006

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _____

    Randy Lipsitz, Esq. (RL-1526)
    Richard L. Moss, Esq. (RLM-7948)
    Aaron M. Frankel, Esq. (AMF-9348)
    1177 Avenue of the Americas
    New York, New York 10036
    Tel.: (212) 715-9100
    Fax: (212) 715-8000
    Attorneys for Plaintiff
    Advance Magazine Publishers Inc. d/b/a
    The Condé Nast Publications
             &
    Attorneys for Third Party Defendant
    Advance Publications, Inc.

OF COUNSEL:

Jerry S. Birenz, Esq.
Michael J. Anderson, Esq.
SABIN, BERMANT & GOULD LLP
4 Times Square, 23rd Floor
New York, NY 10036-6526
Tel.: (212) 381-7000

KL3:2520487.7